UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CASE NO. 3:14-CV-482-MOC-DSC

| | | |
|---|---|---|
| WILLIAM ROSARIO ALESSI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **DEFENDANTS' MEMORANDUM OF** |
| v. | ) | **LAW IN SUPPORT OF MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| BOBBY HAULK, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## 1.  <u>INTRODUCTION</u>

This is a civil rights action under 42 U.S.C. § 1983 seeking damages for alleged false arrest and malicious prosecution under federal and state law.  The Plaintiffs are William and Sonia Alessi, husband and wife. (hereinafter "William" and "Sonia").  The Defendants are the Town of Waxhaw, Police Chief Michael Eiss, and Detective Lieutenant Bobby Haulk.

William was arrested on a warrant charging him with one count each of extortion and cyberstalking for sending an email to a New York resident threatening to release the victim's personal information unless he sent $1,000 cash via overnight delivery to a Waxhaw address three doors down from the Alessi residence.  The arrest warrant was obtained by Det. Haulk following joint investigation by the SBI which traced the email to the IP address assigned to William's Road Runner account.  The District Attorney obtained a grand jury indictment against William one month later, before ultimately dismissing the charges at the urging of William's attorney.

The claims are primarily William's, although Sonia seeks damages for loss of consortium and alleged unlawful entry into her home by the police.

The First Amended Complaint (hereafter "FAC") asserts the following causes of action:

1. Section 1983 claim alleging William was arrested and prosecuted without probable cause, including a *Monell*[1] allegation the Town was deliberately indifferent to the need to properly supervise and train its officers;

2. False arrest and illegal imprisonment under state law;

3. Malicious prosecution under state law;

4. Intentional infliction of emotional distress under state and federal law;

5. Negligent infliction of emotional distress under state and federal law;

6. Trespass to real property under state law;

7. Loss of consortium under state law; and

8. Punitive damages under state and federal law.[2]

On the federal claims, Det. Haulk is entitled to summary judgment on both the merits and on the basis of qualified immunity. On the state law claims, he is entitled to summary judgment on both the merits and on the basis of public official immunity.

Chief Eiss is entitled to summary judgment on all claims because he neither directed nor participated in Haulk's investigation.

The Town is entitled to summary judgment on the *Monell* claim because Chief Eiss had no reason to question Haulk's investigative skills or see to it he received additional or different training.

Lastly, all Defendants are entitled to summary judgment for Plaintiffs' failure to list these claims in the bankruptcy case they filed the following year. Neither at case inception, nor at any time prior to discharge, did Plaintiffs disclose these preexisting legal claims against the police as

---

[1] *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
[2] A claim for punitive damages is "not a cause of action" in and of itself. *Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009).

assets of the bankruptcy estate. Accordingly, the claims are now barred.

2.    **STATEMENT OF FACTS**

On the morning of October 25, 2011 Detective Sergeant Bobby Haulk of the Waxhaw Police Department received a phone call from a man who identified himself as Louis Siegel, a resident of Great Neck, New York.  Mr. Siegel told Haulk he had just received an email from someone calling himself Roni Valetta, who claimed to have hacked into Siegel's computer, and was threatening to publically release Siegel's personal information unless Siegel sent $1,000 cash via overnight delivery to a Waxhaw residential address.  Siegel forwarded the email to Haulk, who confirmed its content and noted the sender's email address was listed as rvaletta1976@aol.com. (Haulk Declaration, Exh. 1 to Defendants' Motion, ¶ 3).  The email itself, which is Exh. 1A, reads as follows:

> Okay here is the deal….I just spent the last few days hacking into pretty much every source of communication you have ever had. Everything from email accounts to social networks I have it all. I have acquired every contact that you have ever had and I can easily share our dirty secrets (pic's and all) with them by clicking "send". I even found some interesting things about you along the way…

> As much as I think you're a scumbag (and I am sure your wife, kids, family, boss, co-workers, clients, and general public will agree), I am not out to for personal gain by destroying your life. I am only in it for a quick payday. You have only one option that will prevent me from clicking "send" and that is to send $1,000 in cash (in (10) ONE HUNDRED DOLLAR BILLS) VIA FED-EX to:

> RONI Valetta
> 8200 Whitehawk Hill Rd.
> Waxhaw, NC 28173

> You have ONLY until end of day today 10/25/11 to send it and it must be sent PRIORITY OVERNIGHT in a LETTER ENVELOPE. Follow my instructions to the "T" and I assure you that you will never hear from me again and our secrets will remain secrets.

> However, if you make any half-witted futile attempt to try and defuse this situation or if I do not have a package delivered by 10am 10/26/11, I will click "send" and leave you to answer for your personal actions.

3

Haulk could see the email was an obvious extortion attempt seeking to coerce Siegel into sending ten one-hundred dollar bills via overnight delivery to Roni Valetta at 8200 Whitehawk Hill Rd., Waxhaw, NC, 28173. Haulk searched multiple databases, including law enforcement and DMV, but could not locate anyone named Roni Valetta. Haulk and his partner, Detective Roger Coan, drove to the Whitehawk Hill Road neighborhood in an unmarked car and saw that the single family home at the stated address appeared to be in foreclosure, as it appeared empty and the grass and shrubbery in the front yard were unkempt. (Exh. 1, ¶ 4).

Upon returning to the police department Haulk arranged with Federal Express to deliver an empty envelope to the stated address at 9:50 a.m. the following morning. Haulk and Coan staked out the location from a safe distance and watched the delivery being made. When no one picked up the envelope by 11 a.m., they retrieved it and left the area. (Exh. 1, ¶ 5).

As of that time Haulk had been in law enforcement for 37 years, most of that time as a detective. He was a graduate of the FBI National Academy, he had enjoyed a lengthy career with the Monroe Police Department, and had even served as Monroe's Chief from 1997 to 2004. After leaving Monroe, he was recruited by Waxhaw's Chief, and agreed to accept a part time detective position assigned to the investigation of general crimes. (Exh. 1, ¶ 2). But despite his professional background, Haulk had never before investigated an act of online extortion, and neither had Det. Coan. Even today, this remains the only computer-related extortion crime Haulk has ever investigated. Haulk therefore contacted Special Agent Kevin Kimbrough at the North Carolina State Bureau of Investigation (SBI), as Haulk knew that computer crime was his area of expertise. Haulk gave Kimbrough an overview of the extortion and provided the email sent to Mr. Siegel. Kimbrough told Haulk he would use administrative search warrants to try and identify the sender of the email. (Exh. 1, ¶ 6); (Kimbrough Decl., Exh. 2, ¶ 3).

4

On or about December 15, 2011, Agent Kimbrough informed Haulk he had traced the email to the residence of William Alessi at 8214 Whitehawk Hill Rd., just three doors down from where the money drop was to have occurred. Kimbrough explained he had obtained records from AOL showing that the email account of rvaletta1976@aol.com was established on October 18, 2011 from a computer with an IP address of 71.75.249.170. (Exh. 1, ¶ 7) (Exh. 2, ¶ 3). (a copy of the AOL records is Exh. 2A). Kimbrough explained he then obtained records from Time Warner Cable showing that IP address was assigned to the Road Runner account of William Alessi at 8214 Whitehawk Hill Rd. on October 25, which was the date the email was sent to Mr. Siegel. (Exh. 1, ¶ 7) (Exh. 2, ¶ 3). (a copy of the Time Warner records is Exh. 2B).

Believing this information strongly suggested the extortion attempt came from William's computer, Haulk asked Kimbrough for his opinion as to whether probable cause existed to seek a search warrant. Kimbrough said yes. (Exh. 1, ¶ 8) (Exh. 2, ¶ 4). Haulk therefore prepared a search warrant application on December 20, 2011 for the Alessi's residence. (Exh. 1, ¶ 8) (a copy of the search warrant application and warrant is Exh. 1B). The search warrant was signed that same day by Magistrate Gayle Smith. (Exh. 1, ¶ 9). After receiving the search warrant, Haulk checked further into William's background by searching the police department's call history for his residence. Haulk learned that on November 19, 2011, just one month prior, William had called the police complaining about the aggressive conduct of a vehicle repossessor who was attempting to take one of his cars. Given Haulk's training and experience, including knowledge that desperate people tend to do desperate things, he believed William's inability to make his car payments showed he was financially distressed, which could provide motive to extort money from total strangers. (Exh. 1, ¶ 9).

The following day, December 21, Haulk and Coan and drove to the Alessi residence and spoke to William at the front door but did not tell him about the search warrant. Because it appeared William felt uncomfortable speaking to them in front of his family, including young children, they agreed he would come down to the police department after taking a shower. Before leaving detectives asked William for his computers, and they left with the only computer William said was in the house, which was a desktop computer from the kitchen. (Exh. 1, ¶ 10).

About one hour later William arrived at the police department stating his wife had dropped him off. After telling him he was not under arrest and was free to leave at any time, he was escorted to an interview room and questioned about the attempted extortion of Mr. Siegel. William denied any knowledge of that, and said he has people coming into his house all the time, implying that any one of them could have used his computer to send the email. The interview lasted only about eight minutes before William appeared to become agitated and asked to leave. Haulk told William they had already secured a search warrant and would be driving back to the house to conduct the search. William asked for a ride and returned to the house with the detectives. While en route William was allowed to call his wife so she could take their young daughters out of the house and not be around while the search was conducted. (Exh. 1, ¶ 11).

The search was conducted after William read the search warrant. Two laptops were seized from an upstairs room that appeared to be an office. The room had a computer desk with four monitors and a keyboard, but no computer hooked up. William told detectives he would hand carry the desktop computer from downstairs to upstairs whenever he needed it. At the conclusion of the search, the detectives left with the two laptops, a power cord, what appeared to be a zip drive, and two CD's. (Exh. 1, ¶ 12). After driving away from the house, but while still in the neighborhood, Haulk saw someone run from the Alessi residence to a house across the

street.  As the detectives drove back towards the house for a closer look, Sonia Alessi came out of a garage across the street carrying two large bags, one gray and one white.  By the time the detectives reached the Alessi residence, Sonia had already gone inside. Haulk went to the front door and asked Sonia what was in both bags. Sonia denied carrying two bags, and produced only the gray bag, which contained a sleeping bag. (Exh. 1, ¶ 13).

Upon returning to the police department Haulk reviewed the information learned to date and felt strongly that William's suggestion anyone could have entered his house and used his computer to send the Siegel email to be highly unlikely.  Haulk therefore called the Union County District Attorney's Office and spoke to Asst. D.A. Jonathan Perry, who he knew prosecuted financial crimes.  He told Perry about the email to Mr. Siegel, the information obtained by the SBI from AOL and Time Warner Cable, the fact William lived at the house with just his wife and two young children, the execution of the search warrant, and the discovery of a recent attempted vehicle repossession, and asked if he felt probable cause existed for issuance of an arrest warrant charging William with cyberstalking and extortion. Perry told Haulk there was sufficient probable cause. (Exh. 1, ¶ 14) (Perry Decl., Exh. 3, ¶ 3).

The following morning, December 22, Haulk drove to the Union County Magistrate's Office and was placed under oath by Magistrate T.B. Eudy.  Haulk testified about the email to Mr. Siegel on October 25, how the sender's email account with AOL had been established using an IP address that, according to Time Warner Cable records, was assigned to William Alessi on October 25, that William lived in the house with just his wife and two young children, that the address where the $1,000 was to be sent was a vacant home just three houses away from William's house, that William may have had a vehicle repossessed on or about November 19, and that detectives had already served a search warrant and recovered one desktop and two

7

laptop computers. Based upon this information, Magistrate Eudy issued the arrest warrant which is Exh. 1C to Haulk's Declaration. Haulk then drove to the Alessi residence and placed William under arrest and transported him to the Union County Detention Center for booking by the Union County Sheriff's Office. Contrary to an allegation in the FAC made upon information and belief, at no time did Haulk ever contact the media about William's arrest, nor did he ask anyone else to do so. (Exh. 1, ¶ 15). William was in custody for 13 hours before being released on a $5,000 bond. (FAC, ¶ 54).

Within the next week Haulk contacted the SBI to arrange for forensic examination of the seized computers. (Exh. 1, ¶ 16) (Exh. 2, ¶ 5). He was told they were too backed up with larger cases that took priority, and that he should try reaching out to Charlotte-Mecklenburg P.D. for help. But when Haulk contacted Charlotte-Mecklenburg P.D., he was told they were too busy with their own cases and could not accommodate an outside agency's request for forensic examination. (Exh. 1, ¶ 16).

On January 30, 2012 Haulk testified before the Union County grand jury to the same information presented to Magistrate Eudy. After the D.A.'s presentation of evidence, the grand jury indicted Alessi on both charges. (Exh. 1, ¶ 17) (a copy of the indictment is Exh. 1D). Haulk later expected to hear from the D.A.'s office about arrangements being made for examination of the computers but never did. He therefore figured the case had been plead out, as most of his cases have been over his 41 year career. He did not learn the D.A. had dismissed the charges or that they had been expunged until after the fact. (Exh. 1, ¶¶ 18-19).

Significantly, when the D.A.'s office dismissed the charges on April 3, 2013, they did so based upon several factors, none of which reflected a belief that William was factually innocent. First, the D.A.'s office considered the cost of having to bring an out of state victim from New

York to a trial here in North Carolina for a matter where the victim was not owed any restitution. (Decl. of Craig Principe, Exh. 4, ¶ 3). They also considered the reality of "limited prosecutorial and judicial resources," given that the case was "one of thousands" they prosecute annually, "and one of several dozen already awaiting trial at the time." In the end, they decided "that while probable cause existed for both charges, it would be difficult to prove each element of each offense beyond a reasonable doubt to twelve jurors at trial." (Exh. 4, ¶ 4). The D.A.'s office therefore dismissed the charges at the request of William's attorney. (Exh. 4, ¶ 3).

3.   **THE DEFENDANTS ARE WITHOUT LIABILITY UNDER 42 U.S.C. § 1983**

A.   **The Search of the House and the Arrest and Prosecution of William were Supported by Probable Cause**

(1) **The Search**

Probable cause for a search warrant "exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *U.S. v. Grubbs*, 547 U.S. 90, 95, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006). Det. Haulk's warrant application (Exh. 1B) conveyed to Magistrate Smith, *inter alia*, how Mr. Siegel received the email (¶ 2), how the detectives found no records of anyone with the purported sender's name (¶ 3), how the SBI tracked the email as originating through an IP address tied to William's street address (¶ 5), and how the extortion payment was to be delivered to an address that was "physically three doors down" from William's house (¶ 5). William, on the other hand, alleges that Haulk was "dishonest and deceitful in his affidavit by stating that the email account in question, RValetta1976@aol.com, 'came back to a person by the name of William Alessi, 8214 Whitehawk Hill Road in Waxhaw, N.C.'" (FAC, ¶ 22).

While it is true that Haulk's shorthand characterization was inaccurate in that it blended together the information received from AOL with what was later received from Time Warner

9

Cable, he only meant to convey that the email sent to Mr. Siegel was in fact traced back to the IP address at 8214 Whitehawk Hill Rd. (Haulk Decl., Exh. 1, ¶ 8).  An officer's misstatement in a search warrant affidavit is constitutionally problematic only where it was "material" to the magistrate's decision to authorize the search. *Evans v. Chalmers*, 703 F.3d 636, 651 (4th Cir. 2012).  Materiality is determined by excising the misstatement to see if the corrected affidavit would still "provide adequate grounds for the search." *Ibid*.  Here, the sentence identifying William Alessi as the accountholder of the email service was not material to the magistrate's decision, because even after excising it, paragraphs 4-5 of the affidavit still collectively established that the SBI had determined the email to Mr. Siegel was sent from an IP address located at "8214 Whitehawk Hill Rd in Waxhaw, NC [which] is physically three doors down from the residence where the money was to be dropped at." (Exh. 1B, ¶ 5) (Exh. 2, ¶¶ 3-4).

The question then becomes whether tracing the extortion email to William's house provided probable cause for issuance of the search warrant.  Clearly it did.  In *U.S. v. Brown*, 701 F.3d 120 (4th Cir. 2012), a child pornography case, the Fourth Circuit examined the sufficiency of a search warrant application showing that downloaded pornographic files were traced to a particular IP address within a company known as Medical Transport.  The Court concluded the IP address confirmation gave detectives "probable cause to believe that child pornography was being downloaded at the Medical Transport building" and that "they could reasonably believe that it was being downloaded at that location" by either of two employees who were the only occupants at the time. *Id*. at 126.  Similarly, here, Magistrate Smith could reasonably rely upon the tracing of the IP address for the offending email to William's house.

### (2) <u>The Arrest and Prosecution</u>

William was arrested on a warrant charging him with extortion and cyberstalking. A person commits felony extortion whenever he "threatens or communicates a threat or threats to another with the intention thereby wrongfully to obtain anything of value . . . ." N.C.G.S. § 14-118.4. The cyberstalking statute, on the other hand, makes it a misdemeanor to send an "electronic communication . . . for the purpose of extorting money or other things of value from any person." N.C.G.S. § 14-196.3(b)(1).

William alleges he "was falsely arrested, illegally imprisoned, and maliciously prosecuted in violation of his Fourth and Fourteenth Amendment rights." (FAC, ¶ 74). However, since William was arrested on a warrant, his claim sounds in malicious prosecution, not false arrest. *See Porterfield v. Lott*, 156 F.3d 563, 568 (4th Cir. 1998) ("[A] public official cannot be charged with false arrest when he arrests a defendant pursuant to a facially valid warrant. At most, such an official can be pursued through a cause of action for malicious prosecution."). In order "[t]o state such a Fourth Amendment claim [for malicious prosecution], 'we have required that [1] the defendant have seized plaintiff pursuant to legal process that was not supported by probable cause and [2] that the criminal proceedings have terminated in plaintiff's favor.'" *Massey v. Ojaniit*, 759 F.3d 343, 356 (4th Cir. 2014).

Here, both elements are missing. Starting with favorable termination, mere dismissal of the charges is not enough: the dismissal must indicate the accused is innocent. *See, e.g., Elkins v. Broome*, 328 F.Supp.2d 596, 599 (M.D.N.C. 2004) ("The 'favorable termination' requirement has been narrowly interpreted to encompass 'only terminations that indicate that the accused is innocent.'"). As explained by Asst. D.A. Craig Principe, the factors influencing the dismissal of William's charges included things like the direct request from his attorney, "limited prosecutorial

and judicial resources," and the cost of transporting Mr. Siegel from New York to North Carolina for a matter in which he was owed no restitution. (Exh. 4, ¶¶ 3-4). There was nothing about the dismissal suggestive of innocence. To the contrary, Principe believed that both charges were supported by probable cause. (Exh. 4, ¶ 4).

Indeed, the existence of probable cause also defeats the malicious prosecution claim. "Probable cause exists when the facts and circumstances known to the officer are sufficient to warrant an objectively reasonable person in believing 'that the suspect has committed, is committing, or is about to commit an offense.'" *Ross v. Early*, 746 F.3d 546, 561 (4th Cir. 2014). Here, Magistrate Eudy had the sworn testimony of Det. Haulk explaining the sequential steps of his investigation from start to finish. With the SBI's assistance, that investigation led to the business record from Time Warner Cable confirming that the IP address used to create the rvaletta1976@aol.com email account on October 18 was still "assigned" to William Alessi when the extortion email was sent seven days later on October 25. Add to the mix that William lived in the house with just his wife and two young children, that the address where the $1,000 was to be sent was a vacant home just three houses away, and that he appeared to be financially distressed given the recent incident with the auto repossessor, Magistrate Eudy could reasonably infer motive and be satisfied that probable cause existed to charge him with both extortion and cyberstalking. Also compelling is the grand jury indictment one month later, since absent evidence the arresting officer "misled or unduly pressured the prosecutor," a prosecutor's "independent decision to seek an indictment breaks the causal chain" and spares the officer from liability for malicious prosecution. *Evans v. Chalmers, supra*, 703 F.3d at 649.

It cannot be overemphasized that further certainty or proof of William's guilt was unnecessary. The Fourth Circuit has specifically rejected the argument that "probable cause

means more likely than not, [more than] 50/50," and has made it clear that "the probable-cause standard does not require that the officer's belief be more likely true than false." *U.S. v. Humphries*, 372 F.3d 653, 660 (4th Cir. 2004). *See also Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (the concept of probable cause "does not demand any showing that [an officer's] belief be correct or more likely true than false"). That being so, the existence of probable cause supporting William's arrest mandates summary judgment in Haulk's favor.

### B. At the Very Least, Haulk and Eiss are Entitled to Qualified Immunity

#### (1) Det. Haulk

Even in cases where the plaintiff was deprived "of an actual constitutional right, . . . [p]olice officers performing discretionary acts 'generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Robles Prince George's County*, 302 F.3d 262, 270 (4th Cir. 2002). In *Saucier v. Katz*, 533 U.S. 194, 195, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court laid out a two-step process for resolving the qualified immunity claims of government officials. First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. *Id*. at 201. Second, a court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Ibid*. Courts may exercise discretion in deciding which of the two *Saucier* prongs "should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Notably, it is the plaintiff's burden to overcome a defendant's presumptive entitlement to qualified immunity. *Crawford-El v. Britton*, 523 U.S.

574, 589, 118 S. Ct. 1584, 1592 (1998) (plaintiff bears the "burden of proving a constitutional violation"); *Davis v. Scherer*, 468 U.S. 183, 197, 104 S.Ct. 3012, 82 L.Ed. 2d 139 (1984) ("A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue.").

Here, the undisputed facts do not support a constitutional violation in the first place. The search warrant application provided a summary of Haulk's investigation including the fact the email sent to Mr. Siegel was determined by the SBI to have originated through the IP address located at 8214 Whitehawk Hill Rd., just three doors down from the house where the money drop was to occur. The magistrate's decision to issue the search warrant was therefore supported by probable cause. Two days later, a second magistrate considering the arrest warrant application heard the evidence tying the email to William's computer plus the more recently acquired evidence of motive, *i.e.*, the attempted auto repossession, and that detectives had confirmed William lived at the house with just his wife and two small children. Again, that evidence, collectively viewed, amply supported a reasonable belief that William had sent the email in a desperate effort to raise cash before the impending holidays.

But even if probable cause had been lacking for either warrant, Haulk would still be entitled to qualified immunity. It is one thing for a police officer to take it upon himself to conduct a warrantless search or make a warrantless arrest, as officers must often do. It is quite another thing when an officer, time permitting, is able to seek intermediate levels of outside scrutiny before taking either action, and actually does so. Haulk's conduct in this case falls into the latter category. Before seeking the search warrant, Haulk discussed the investigation with the SBI's computer crime expert, Special Agent Kimbrough. Only after receiving Kimbrough's

opinion that probable cause existed did Haulk apply for the search warrant. That same level of attention carried over to Haulk's consideration of whether probable cause existed for William's arrest. Instead of rushing out and making a warrantless arrest, which he could have done, Haulk took two intermediate steps. First, he contacted Asst. D.A. Jonathan Perry, who was experienced in prosecuting financial crimes, and obtained his opinion there was probable cause to arrest. Second, Haulk went to the Magistrate's Office and applied for a warrant.

The doctrine of qualified immunity looks favorably upon police officers who seek the professional opinions of qualified individuals on the issue of probable cause before conducting a search or seizure. Receiving confirmation of probable cause to search from the SBI's computer crimes expert, and probable cause to arrest from a prosecutor who handles financial crimes, goes a long way towards finding Haulk entitled to qualified immunity. *See Wadkins v. Arnold*, 214 F.3d 535, 542 (4th Cir. 2000) (prosecutor's advance approval of arrest warrant obtained by officer "is compelling evidence and should appropriately be taken into account in assessing the reasonableness of [the officer's] actions"). *See also Kelly v. Borough of Carlisle*, 622 F.3d 248, 255-56 (3rd Cir. 2010) ("[W]e hold that a police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause."). Notably, the same can also be said for Haulk taking the time to seek search and arrest warrants before acting upon the already sound information provided by the SBI. *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991) ("When a police officer protects a suspect's rights by obtaining a warrant from a neutral magistrate, the officer should, in turn, receive some protection from suit under 42 U.S.C. § 1983. Otherwise, the threat of liability would force officers to continuously

second-guess the considered decisions of magistrates. This in turn would promote delay in the execution of warrants, and alter the proper allocation of law enforcement functions.").

The bottom line is that there was nothing about Haulk's conduct that violated William's constitutional rights.  Indeed, William had no clearly established right *not* to have his home searched, or *not* to be arrested, under these facts.  That being so, Haulk is entitled to qualified immunity as a matter of law.

### (2) Chief Eiss

Chief Eiss appears to be a defendant on all causes of action even though he neither directed nor participated in Haulk's investigation of William. (Eiss Decl., Exh. 5, ¶ 5).  Since supervisory liability under Section 1983 requires "personal involvement" in a constitutional deprivation, Haulk is entitled to summary judgment both on the merits and on the basis of qualified immunity.  *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).

### C.  The *Monell* Claim Against the Town Necessarily Fails as Well

As a threshold matter, the lawfulness of the searches and seizures forecloses any *Monell* liability for the Town. *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (municipal liability will not attach where "a person has suffered no constitutional injury at the hands of the individual police officer").  Moreover, there is zero evidence to support the allegations the Town was deliberately indifferent to the need to properly supervise and train its officers, and that it had a policy or custom of allowing police officers to make arrests without probable cause. (FAC, ¶¶ 75-80).

As for the alleged policy or custom of condoning illegal arrests, it has always been departmental policy under Chief Eiss that officers may conduct only lawful searches and seizures and must respect the constitutional rights of those under investigation.  SOP 400-01 as written in

16

2011 expressly stated as follows: "It shall be the policy of the Waxhaw police department to discover illegal violations and apprehend violators. In carrying out these responsibilities, all officers are expected to act in a manner which protects the rights of citizens and suspects." According to Eiss, any unlawful search or seizure by his officers therefore departed from, rather than represented, this policy. It is therefore no surprise that the Alessi lawsuit has been the only civil action filed against the Town of Waxhaw or its police personnel alleging unlawful search or seizure since Eiss became Chief of Police. (Exh. 5, ¶ 10). Moreover, the Alessi lawsuit represents the *only* complaint Eiss has ever received about Haulk's competence as an investigator. To the contrary, Eiss has received only appreciative comments about Haulk's work from both members of the community and other law enforcement agencies. (Exh. 5, ¶ 4).

As for the alleged failure to train, all Waxhaw officers must have attended and successfully completed the state mandated Basic Law Enforcement Training Program ("BLET") covering a variety of topics, including the law of search and seizure. All officers, regardless of rank, including Det. Haulk, are required to attend at least 24 hours of refresher training each and every year. In addition to this mandated training, officers on occasion receive informal roll call training from their shift supervisors on a variety of topics including search and seizure issues. Chief Eiss has also made it a point to accommodate whenever possible officers' requests to attend off-site training classes on topics related to criminal investigations. (Exh. 5, ¶ 9).

The fact that Haulk had not been specifically trained in cybercrime investigation is of no moment since there was prior indication it was necessary. Indeed, the Alessi investigation remains the only computer-related extortion crime Haulk or Coan has ever investigated. (Exh. 1, ¶ 6). Not only that, Chief Eiss is unaware of any other computer-related or cybercrime investigations conducted by Waxhaw P.D. since he became Chief. Accordingly, Haulk reaching

17

out to the SBI for assistance is exactly what a reasonable investigator should do when encountering technical matters outside his or her area of familiarity. (Exh. 5, ¶ 6).

As the Supreme Court has explained, it will never "suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct, [as] [s]uch a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal." *Canton v. Harris*, 489 U.S. 378, 391, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Because cybercrime was not a "usual and recurring situation" for Waxhaw P.D., there can be no *Monell* liability for failure to train.

**4.     THE EXISTENCE OF PROBABLE CAUSE BARS THE STATE LAW CLAIMS AS WELL**

**A.  On the Merits**

North Carolina law is coterminous with federal law on the issue of probable cause. For there to be probable cause for issuance of a search warrant, "[a] magistrate must 'make a practical, common-sense decision,' based on the totality of the circumstances, whether there is a 'fair probability' that contraband will be found in the place to be searched." *State v. McKinney*, __ N.C. __, 2015 WL 4999675 at *3 (N.C. Supr. Ct., 8/21/15). "Probable cause to arrest exists when the officer has reasonable grounds to believe that a crime has been committed and that the suspect committed it." *Richardson v. Hiatt*, 95 N. C. App. 196, 200, 381 S.E.2d 866, 868 (1989).

Like federal law, North Carolina treats claims alleging lack of probable cause for an arrest made pursuant to a warrant as sounding in malicious prosecution rather than false arrest.

> When a prior criminal prosecution is the subject thereof, an action for malicious prosecution cannot be maintained unless the prior criminal prosecution was based on valid process. [citations] It is otherwise in actions

> for false arrest or false imprisonment. [citation] Whether an action is
> maintainable as an action for malicious prosecution or as an action for false
> arrest or imprisonment often turns upon whether the arrest or imprisonment
> is under valid process. [citation]

*Local 755, Int. Bro. of El. Wkrs. v. Country Club E. Inc.*, 283 N.C. 1, 8, 194 S.E.2d 848, 853

(1973) (emphasis added). Notably, the "favorable termination" element of malicious prosecution

is absent where the dismissal of criminal charges came, as here, at the plaintiff's own request.

*Marcus v. Bernstein*, 117 N.C. 31, 34, 23 S.E. 38, 39 (1895) (a malicious prosecution claim will

not lie "when a nol. pros. is obtained by the procurement or consent of the plaintiffs").

Because the legal analysis is the same, a finding that the search and arrest warrants were

supported by probable cause, and therefore lawful under the Fourth Amendment as explained

hereinabove, compels the finding they were also lawful under state law. As such, they cannot be

the basis of tort liability under state law, regardless of the theory of relief asserted. *See, e.g.,*

*Doe v. Diocese of Raleigh*, —— N.C.App. ——, 776 S.E.2d 29, 40 (2015) (plaintiff lacked a

viable claim for negligent infliction of emotional distress because the underlying negligence

claim was itself "subject to dismissal").

### B.  On the Basis of Public Official Immunity

Under the doctrine of public official immunity, "police officers enjoy absolute immunity

from personal liability for their discretionary acts done without corruption or malice."

*Schlossberg v. Goins*, 141 N.C.App. 436, 445, 540 S.E.2d 49, 56 (2000). The burden of proof on

the issue of public official immunity rests with the plaintiff. In other words, it is the plaintiff's

burden to prove a defendant is not entitled to immunity. *See, e.g., McCarn v. Beach*, 128 N.C.

App. 435, 437, 496 S.E.2d 402, 404 (1998) (a plaintiff seeking to defeat an officer's motion to

dismiss on grounds of public official immunity "must make a prima facie showing that the

officer's conduct is malicious, corrupt, or outside the scope of his official authority").

There is no evidence that Haulk or Eiss acted with malice or corruption towards William or Sonia Alessi. They are accordingly entitled to public official immunity on the state law claims as a matter of law.

**5.**    **PLAINTIFFS' FAILURE TO LIST THEIR CLAIMS AGAINST DEFENDANTS IN THEIR BANKRUPTCY FILING ALSO OPERATES AS A BAR**

### A. 11 U.S.C. § 521(a)(1)(B)

On or about September 21, 2012, William and Sonia jointly filed a petition for Chapter 13 bankruptcy in the Western District of North Carolina under Case No. 12-32293. (A copy of the Petition from the court file, judicial notice of which is requested,[3] was produced by William during discovery, and is Exh. 6 to this motion.) The bankruptcy case was converted to Chapter 7 on or about November 26, 2012, following which William and Sonia received a discharge on April 28, 2014, a little over four months before filing this Section 1983 action on September 2, 2014. (Exh. 7).

Under federal bankruptcy law, the bankruptcy estate comprises, with exceptions not applicable here, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). This definition "has been construed 'broadly to encompass all kinds of property, including intangibles.'" *In re Bogdan*, 414 F.3d 507, 512 (4th Cir. 2005). "More specifically, 'property of the estate' under § 541(a) has 'uniformly been interpreted to include causes of action.'" *Ibid*.

"The bankruptcy code place[s] an affirmative duty on [a debtor] to schedule his assets and liabilities." *Cusano v. Klein*, 264 F.3d 936, 945 (9th Cir. 2001); 11 U.S.C. § 521(a)(1)(B). Here, none of the bankruptcy schedules filed by the Alessi's mentioned any of the claims

---

[3] *Anderson v. FDIC*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990) ("[T]he Bankruptcy Court is considered 'a unit of the district court' under 28 U.S.C. § 151, and we believe a district court should properly take judicial notice of its own records . . . .").

asserted in this litigation. (*See, e.g.*, Schedule B, Line 21, filed Nov. 26, 2012, which was never amended to include these claims) (Exh. 8 hereto). The Alessi's are therefore without standing to pursue any claims which had accrued prior to the September 21, 2012 bankruptcy filing. *See, e.g., Vinal v. Federal Nat. Mortg. Ass'n*, 2015 WL 5535191 at \*6-7 (E.D.N.C. 2015) (trespass claim "that was never disclosed to the bankruptcy court is considered property of the estate and is surrendered to the bankruptcy trustee at filing" resulting in debtor's lack of standing to pursue it following discharge). Those claims include false arrest, infliction of emotional distress, trespass, and unlawful search and seizure, because each accrued in December 2011 when the challenged searches and seizures were made. *See, e.g., Brooks v. City of Winston-Salem*, 85 F.3d 178, 182 (4th Cir. 1996) (a claim for false arrest accrues on the date of arrest); *Smith v. McCarthy*, 349 Fed.Appx. 851, 856-57 (4th Cir. 2009) (affirming dismissal of claims for "illegal entry upon Plaintiffs' property" filed beyond the statute of limitations because the claims accrued immediately). The malicious prosecution claim, on the other hand, did not fully accrue until the dismissal of criminal charges on April 3, 2013. *Brooks, supra*, 85 F.3d at 183.

That being said, there is authority in this Circuit for the proposition that even though the malicious prosecution claim did not *fully* accrue until the criminal charges were dismissed, the nature of the claim was so "rooted in the pre-bankruptcy past" that it was an asset of the estate and should have been scheduled. In *In re Andrews*, 80 F.3d 906, 910 (4th Cir. 1996), the Fourth Circuit held that post-petition payments to the debtor under a preexisting non-compete agreement were "properly included in the debtor's estate because they were 'sufficiently rooted in the pre-bankruptcy past . . . .'" Likewise, a bad faith claim against an insurer that did not fully accrue until after the bankruptcy filing was also treated as an asset of the estate. *Field v. Transcontinental Insurance Co.*, 219 B.R. 115, 119 (E.D.Va. 1998), *aff'd*, 173 F.3d 424 (4th Cir.

Cir. 1999) ("the bankrupt's estate includes not only claims that had accrued and were ripe at the time the petition was filed, but also those claims that accrued postpetition, but that are 'sufficiently rooted in the pre-bankruptcy past'").  Most notably, one court intimated that a malicious prosecution claim would be an asset of the estate if the criminal charges were already pending when bankruptcy was declared, even though not dismissed until later on.  *See In re Jenkins*, 410 B.R. 182, 193 (Bankr.W.D.Va. 2008) (finding that malicious prosecution claim "was not rooted *sufficiently* in pre-petition conduct" because there was no criminal prosecution as yet when the petition was filed) (emphasis added).  Here, by contrast, the criminal charges against William had already been filed and pending for over ten months when his petition was filed.

In summary, the Alessi's failure to comply with 11 U.S.C. § 521(a)(1)(B) by never listing a single one of their claims against the Defendants precludes them from doing so now.

## B.  Judicial Estoppel

The doctrine of judicial estoppel provides an additional basis for barring the claims. "Judicial estoppel 'prevents a party who has successfully taken a position in one proceeding from taking the opposite position in a subsequent proceeding.'" *U.S. ex rel. Saidiani v. NextCare, Inc.*, 2014 WL 4672417 at *4 (W.D.N.C. 2014).  "In order for judicial estoppel to apply (1) the party to be estopped must be advancing an assertion that is inconsistent with a position taken during previous litigation; (2) the position must be one of fact, rather than law or legal theory; (3) the prior position must have been accepted by the court in the first proceeding; and (4) the party to be estopped must have acted intentionally, not inadvertently." *Havird Oil Co., Inc. v. Marathon Oil Co., Inc.*, 149 F.3d 283, 292 (4th Cir. 1998).  In *Saidiani*, the court applied judicial estoppel to the plaintiff's failure to disclose a *qui tam* claim in his bankruptcy petition. The first element was

satisfied because the plaintiff's failure to list the claim was a representation to the bankruptcy court "that he did not possess the claim . . . ." The omission was one of fact, satisfying element two, and the bankruptcy judge relied on the omission when discharging his debts, satisfying element three. Lastly, the plaintiff "acted intentionally, not inadvertently," because he was aware of his legal claim when filing the petition, and "stood to profit from his deception by shielding any potential recovery in this case from his creditors," satisfying element four. *Saidiani*, 2014 WL 4672417 at *4.

Similarly, here, the Alessi's failure to disclose legal claims they had possessed for over ten months was a representation to the bankruptcy court they had no such claims that could be used for the benefit of their many creditors. That type of deception should not be countenanced, and makes application of judicial estoppel an appropriate remedy.

## 6.   <u>CONCLUSION</u>

Defendants are entitled to summary judgment for any of the following reasons: (1) the search and arrest warrants were supported by probable cause; (2) application of both qualified immunity and public official immunity; or (3) the Alessi's failure to disclose their claims against Defendants to the Bankruptcy Court. Defendants therefore respectfully urge that their motion be granted.

Dated: October 1, 2015

<u>s/Scott D. MacLatchie</u>
Scott D. MacLatchie
North Carolina Bar No. 22824
Womble Carlyle Sandridge & Rice
301 S. College Street, Ste. 3500
Charlotte, North Carolina 28202
Telephone No. (704) 331-4942
*Attorney for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing MEMORANDUM OF LAW was served this date upon the following counsel of record via use of the CM/ECF system, which will send a notification of such filing and a copy thereof:

J. Bradley Smith
Paul A. Tharp
Arnold & Smith
200 N. McDowell St.
Charlotte, NC 28204

Dated: October 1, 2015                    /s/ Scott D. MacLatchie